UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

M C PACKAGING CORPORATION; MARC  :
SILVERBERG; MARC-ROBERT INDUSTRIAL :
LLC; SILVER INDUSTRIES LLC; and   :
MCP GLOBAL CAPITAL MANAGEMENT LLC, :
               :  Case No. 26-cv-_____ (    )
     Plaintiffs,     :
               :  **JURY TRIAL DEMANDED**
   - against -     :
               :
KENNETH P. SILVERMAN; RIMÔN P.C.; :
ANTHONY C. ACAMPORA;     :
SILVERMANACAMPORA LLP;    :
BRIAN K. RYNIKER; RK CONSULTANTS LLC; :
PATRICK CAREW; and PJC CONSULTING LLC, :
a/k/a PJC CONSULTING, INC.,    :
               :
     Defendants.    :

---------------------------------------------------------------------x

## COMPLAINT

Plaintiffs M C Packaging Corporation, Marc Silverberg, Marc-Robert Industrial LLC, Silver Industries LLC, and MCP Global Capital Management LLC, by and through their attorney, Paul Batista, P.C., as and for their Complaint against defendants, respectfully allege as follows:

### Preliminary Statement

1. This action is brought principally under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961-1968 ("RICO"), against law firms, lawyers and putative financial advisors engaged, among other things, in protracted acts of wire fraud and mail fraud over a period of at least four years from 2020 to 2024 resulting in the destruction of a five-decade-old family business and the loss of approximately one hundred jobs of individuals who worked for the family business.

2.      As described in greater detail in the balance of this Complaint, defendants'
wholesale and protracted violations of RICO also entailed violations of New York State common
law regarding breach of fiduciary duty, among other things.

### Jurisdiction and Venue

3.      This Court has federal subject matter jurisdiction under 28 U.S.C. §1331.

4.      This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c)
with respect to the claims arising under RICO.

5.      This Court has supplemental jurisdiction under 28 U.S.C. §1367 with
respect to claims arising under state law.

6.      Venue is proper in this District under 28 U.S.C. §1391(b)(2) and under 18
U.S.C. §1965.

### Parties

*(i)    Plaintiffs*

7.      Plaintiff M C Packaging Corporation ("M C Packaging") is a corporation
established under the laws of the State of New York in September 1966.

8.      Plaintiff Marc Silverberg ("Mr. Silverberg") is a citizen and resident of the
State of New York.

9.      Plaintiff Marc-Robert Industrial LLC is a limited liability company
established and organized under the laws of the State of New York in 2006, the members of which
are Mr. Silverberg, the holder of a 75% membership interest, and Robert Silverberg, the holder of
a 25% membership interest.

10.     Plaintiff Silver Industries LLC is a limited liability company organized
under the laws of the State of New York in 1998, the members of which are Mr. Silverberg, the

holder of a 75% membership interest, and Robert Silverberg, the holder of a 25% membership interest.

11.    Plaintiff MCP Global Capital Management LLC is a limited liability company organized under the laws of the State of New York in 2022, the members of which are Mr. Silverberg, the holder of a 75% membership interest, and Robert Silverberg, the holder of a 25% membership interest.

*(ii)    Defendants*

12.    Defendant Kenneth P. Silverman ("Silverman") is an attorney admitted to practice in the State of New York.

13.    Defendant Rimôn, P.C. ("Rimôn") is a law firm which, in its self-promotional material, describes itself as "a tech-enabled, highly selective, global law firm" with "50 offices in 11 countries," including an office at 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753.

14.    Defendant Silverman is a partner in defendant Rimôn.

15.    Defendant Anthony C. Acampora ("Acampora") is an attorney admitted to practice in the State of New York.

16.    Defendant SilvermanAcampora LLP ("SA") is a law firm organized under the laws of the State of New York which, upon information and belief, "combin[ed]" according to its own press release with defendant Rimôn on October 5, 2023.  Silverman and Acampora were at all relevant times partners of SA.  By reason of the combination of SA and Rimôn, plaintiffs and Rimôn signed retainer agreements with Rimôn and became clients of Rimôn as well as of defendants Silverman, Acampora and SA.

3

17.     Defendants Silverman, Acampora, SA and Rimôn were lawyers representing plaintiffs in connection with events germane to this Complaint.

18.     Defendant Brian K. Ryniker ("Ryniker"), a Certified Public Accountant and self-described "financial advisor," is, upon information and belief, a citizen and resident of the State of New York.

19.     Defendant RK Consultants, LLC ("RK Consultants") is, upon information and belief, a limited liability company organized under the laws of the State of New York with an office at 1178 Broadway, New York, New York 10001.  Defendant Ryniker is a member of RK Consultants.

20.     Defendant Patrick Carew ("Carew") is, upon information and belief, a citizen and resident of New York State and a Director of defendant RK Consultants.

21.     Defendant PJC Consulting LLC, a/k/a PJC Consulting, Inc. ("PJC") is, upon information and belief, a limited liability company organized under the laws of the State of New York or a corporation organized under the laws of the State of New York.  Defendant Carew is, upon information and belief, the controlling person of defendant PJC.

### Statement of Facts Common to All Counts

*A.     Overview*

22.     Plaintiff M C Packaging was for many decades actively involved in the business of fabricating boxes and other containers for a wide array of customers which included, among others, some of the largest manufacturers and distributors of consumer and commercial products in the United States and elsewhere.

23.     In 2020, plaintiff M C Packaging and its affiliates decided they could benefit from expert legal and strategic business advice to address issues arising, in part, from the

4

complications generated by the COVID-19 pandemic, which had widespread impacts starting in March 2020.

24.    At the time plaintiffs determined that it would be useful to secure legal and business advice, the primary business of M C Packaging was continuing to function actively and effectively, as it had for decades, and to employ approximately 100 workers despite the onset and duration of the pandemic.  As articulated more fully in the balance of this Complaint, it was never the intention or desire of Mr. Silverberg or the other plaintiffs to retain or authorize defendants to place into bankruptcy proceedings or to dismantle and to destroy the long and well-established business of any of the plaintiffs.  Yet, as will be alleged, Silverman and the other defendants deceptively conducted themselves over a period of years from 2020 to 2024 to take control of, and to dominate, plaintiffs' businesses and property and to cause the financial destruction of plaintiffs' businesses and property for the purpose, among other things, of generating exorbitant, duplicative and unnecessary fees which defendants demanded and which plaintiffs paid.

B.    *The First Phase: Retention of Defendants Silverman, Acampora, and SA*

25.    Defendant Silverman actively promoted through social media and other platforms the alleged skills, experience and expertise which Silverman, Acampora and their firm SA claimed to possess in counseling and advising businesses.

26.    Based in part on the marketing and other representations of Silverman, Acampora, and SA, plaintiffs were induced in 2020 to execute a retainer agreement with defendant SA.  More specifically, in June 2020, SA and plaintiffs executed a retainer agreement dated June 17, 2020 (the "2020 Retainer Agreement") under which Silverman, Acampora and SA agreed to "provide [plaintiffs] with legal service [including] legal advice, consultation, and representation in connection with [plaintiffs'] operations….[SA] will consult with [plaintiffs] about the goals and

objectives [of plaintiffs] and in particular…with respect to the [plaintiffs'] relationships with M&T Bank…."

27.     From the very outset, Mr. Silverberg and the other plaintiffs continuously and consistently anticipated that defendants Silverman, Acampora, SA and other firms and organizations associated with them would conduct themselves so as to protect plaintiffs' five-decade-old business, as well as the jobs of the approximately 100 workers employed by plaintiffs.

28.     The 2020 Retainer Agreement provided that SA's "[h]ourly rates currently range to $725 for partners…" According to the agreement, defendant Silverman's "hourly rate" was $725. SA required a $10,000 advance retainer, which was promptly paid by plaintiffs. The 2020 Retainer Agreement had no termination date.

29.     An integral and plainly expressed requirement the 2020 Retainer Agreement was that defendants SA, Silverman and Acampora were required to "preserve [plaintiffs'] confidence[s] and secrets that are revealed in the course of the relationship." This contractual provision reflected obligations which Silverman, Acampora and SA in any event owed to plaintiffs under all relevant rules of professional responsibility and which, as will be alleged, they consistently violated over a four-year period ending in 2024.

C.     *Retention of Ryniker, RK Consultants and Carew*

30.     At the urging of defendants Silverman, Acampora and SA, plaintiff M C Packaging and the other plaintiffs, by letter dated November 16, 2020 (the "Ryniker Agreement"), retained defendants Ryniker and RK Consultants to provide "services" defined in the Ryniker Agreement as involving "a potential Chapter 11 filing, both prior to and subsequent to a bankruptcy filing…."

6

31.    The Ryniker Agreement in addition provided (i) that plaintiffs were required to advance $10,000 to RK Consultants, (ii) that plaintiffs were obligated to pay "in advance through an ongoing retainer replenishment program…maintained at $5,000," (iii) that defendant Ryniker's initial hourly rate was $400, and (iv) that Ryniker and RK Consultants could utilize defendant Carew as a "consultant." The Ryniker Agreement contained no termination date.

32.    The reference in the Ryniker Agreement to "a potential Chapter 11 filing, both prior to and subsequent to a bankruptcy filing" was, as Ryniker, Silverman, Acampora, SA and RK Consultants clearly knew, inconsistent with, and directly contradictory of, the frequently articulated positions, plans and objectives of Mr. Silverberg and the other plaintiffs. In fact, as later described in this Complaint and as ultimately took place, all defendants over the course of several years from 2020 to 2024 conceived and illicitly consummated a "shadow bankruptcy" which had the effect of (i) generating exorbitant, duplicative and unnecessary fees paid to defendants by plaintiffs and (ii) depriving plaintiffs of their business and property.

33.    No coherent explanation was provided by Silverman, Ryniker, Acampora or SA as to what Carew's background, qualifications and abilities were. As events unfolded, Carew and his putative firm were inserted for the purposes of (i) eviscerating plaintiffs' business and property, (ii) escalating for no valid reason the fees defendants extracted from plaintiffs during the period 2020 through 2024, and (iii) perpetuating the overall scheme to defraud plaintiffs.

34.    Indeed, no type of formal bankruptcy proceeding was ever filed with respect to any of the plaintiffs. Instead, during a process conducted over a period of years from 2020 to 2024, defendants perpetrated a fraudulent scheme which resulted, among other things, in the loss and destruction of plaintiffs' five-decade-old business and the elimination of plaintiffs' property and business interests.

7

*D.    The Second Phase*

35.    Beginning in 2020 and continuing through 2024, defendants deliberately shifted the focus from viable re-financings to other tactics which were extremely detrimental to plaintiffs.

36.    Mr. Silverberg consistently objected to the shifts in focus.  Mr. Silverberg and the other plaintiffs at all times were certain that the decades-old business remained viable and that commercial property owned by plaintiffs had a market value from 2020 through 2024 of approximately $30 million to $50 million based on bank-ordered appraisals and relevant market data.

*(i)    The Presence of M&T Bank*

37.    At the time plaintiffs retained Silverman, Acampora and SA, M&T Bank Corporation ("M&T"), a bank holding company headquartered in Buffalo, New York, with more than 900 branches located across the United States, including in Nassau County and elsewhere in New York, had for many years a significant banking relationship with plaintiff M C Packaging and the other plaintiffs.  In fact, the 2020 Retainer Agreement specifically referred to plaintiffs' "relationship with M&T Bank" and obligated defendants Silverman, Acampora and SA to address plaintiffs' "relationship with M&T Bank."

38.    By mid-2020, plaintiffs' longstanding relationship with M&T had been strained by external events such as a September 2018 lightning-strike casualty, the loss of capacity during necessary repairs stemming from the lightning-strike, and the March 2020 onset of the Covid-19 pandemic, all of which disrupted borrowing-base eligibility under the credit facility.

39. As a consequence of these events, plaintiffs' concern with M&T was a documented pattern of property appraisals by M&T which materially undervalued plaintiffs' real estate collateral.

40. More specifically, M&T's 2018 and 2019 appraisals were approximately $5 million to $7 million below appraisals from Sterling National Bank for the same period, and a contemporaneous 2019 - 2020 market bid process yielding bids approximately $10 million above M&T's valuations.

41. Likewise, an independent appraisal by Bethpage Bank in June 2021 appraised the same holdings and values of plaintiffs at $45.2 million — more than twice M&T's valuations.

42. This pattern by M&T of collateral undervaluation, together with the need for advice to plaintiffs on their credit relationship with M&T and on alternative lending options, led to plaintiffs' decision in May and June 2020 to seek adequate, unbiased advice.

43. From the outset of plaintiffs' relationship with defendants Silverman, Acampora and SA in May 2020 – shortly before the 2020 Retainer Agreement was signed – Mr. Silverberg emphasized that one of his primary objectives for himself and the other plaintiffs was to retain Silverman, Acampora and SA to assist in the negotiated resolution of the situation plaintiffs faced with M&T.

44. From March 2020, with the start of full onset of the Covid-19 pandemic and then throughout the years of the pandemic and the recovery period, M C Packaging continued to viably conduct its core business of manufacturing boxes and packaging for a wide range of customers and to retain the values of plaintiffs' real estate holdings.

45.    On September 2, 2020, M&T's outside counsel ("M&T Counsel") transmitted to defendant Silverman a draft forbearance agreement and a draft amended and restated note. The proposal by M&T Counsel addressed alleged existing defaults and modified the maturity date, the term-loan amortization, and the required pre-payments.

46.    In fact, the September 2, 2020 transmission from M&T Counsel to defendant Silverman was a cooperative workout proposal and the precise category of bank communication that the retainer agreement between SA and plaintiffs tasked defendants Silverman, Acampora and SA with implementing.

47.    Instead of responding appropriately and responsibly to the September 2, 2020 transmission from M&T Counsel, defendants Silverman, Acampora, SA and the attorneys affiliated with SA delayed responding to M&T Counsel's transmission for twenty-nine (29) days.

48.    Defendants ultimately — and belatedly — acknowledged receipt of the September 2, 2020 communication from M&T Counsel and purportedly undertook to review it.

49.    M&T Counsel on September 14, 2020, notified an SA partner that M&T Counsel had not received a substantive response.

50.    Eventually, on October 1, 2020, M&T Counsel notified defendants that the bank's internal approvals on the modifications M&T proposed on September 2, 2020 would expire the following day.

51.    In response, an SA partner, James M. Black II ("Black"), characterized the M&T communication on October 1, 2020 to plaintiffs in writing as "probably another bluff" by M&T.

52.    Black's derogatory, unprofessional statement was highly detrimental to plaintiffs' interests. Indeed, Jeffrey Novick, a New York attorney who for many years had served

as the trusted counsel to the Silverberg family, within 23 minutes of receipt of a copy of Black's email intervened in writing and instructed Black and the SA defendants "to make every effort to comply with the schedule of the bank and get the comments back to them by tomorrow, without any request for the extension."

53.     This intervention by Mr. Novick — the long-time trusted advisor to the Silverberg family — was necessitated by defendants' willful failure to perform the precise advisory function the retainer agreement obligated the SA defendants to perform.

54.     Defendant Silverman responded to Mr. Silverberg's concerns by advising Mr. Silverberg that Silverman was heavily involved in representing and dealing with banks. Silverman claimed again that he had the experience, industry contacts, and expertise to address the cooperative workout opportunity that M&T had presented and to locate alternative banking support for M C Packaging and the other plaintiffs if alternative banking relationships were necessary.

55.     Notwithstanding Silverman's consistent claims to substantial and successful experience in representing and negotiating with banks and other financial institutions – claims which were identical to those he made in May and June 2020 leading to the 2020 Retainer Agreement between plaintiffs and defendant SA – defendant Silverman in response to the M&T positions for the first time identified defendants Ryniker and RK Consultants as potential assistants to Silverman, Acampora and SA in their representation of plaintiffs.

56.     By the time defendants introduced Ryniker and RK Consultants to plaintiffs, defendants had already failed to perform the M&T-lending advice scope of the retainer agreement as a result of defendants' long-delayed response to M&T's cooperative forbearance proposal, together with the required intervention by Mr. Novick to compel a response by

11

defendants, and defendants' baseless assertion that the M&T communication was "probably another bluff."

57.    Despite Silverman's consistent claims to substantial and successful experience in negotiating with banks and other financial institutions — claims identical to those he made in May and June 2020 to induce plaintiffs to enter the retainer agreement in June 2020 — defendant Silverman identified defendants Ryniker and RK Consultants as potential assistants to defendants Silverman, Acampora and SA in their representation of plaintiffs.

58.    In reality, the introduction of Ryniker and RK Consultants was not a response to any pressure from M&T but was the next step in the overall scheme to defraud which had begun with the SA defendants' deliberate mis-handling of the cooperative work-out procedure proposed by M&T.

59.    Significantly, although defendant Silverman in November 2020 aggressively urged Mr. Silverberg and the other plaintiffs to retain and pay defendant Ryniker and RK Consultants, Silverman provided no explanation as to what, if any, expertise, qualifications or experience Ryniker and RK Consultants could bring to the assistance of plaintiffs.  Nor did defendant Silverman provide any explanation as to what, if any, his and his firm's prior professional, business or other relationships were with Ryniker and RK Consultants.

60.    Likewise, plaintiffs were not provided by any of the defendants with information as to the experience, professional background or qualifications of Ryniker, RK Consultants or Carew, nor were plaintiffs advised of any potential conflicts of interest or self-dealing arrangements as to duplicative fees to be charged by defendants to plaintiffs.

61.    Moreover, Mr. Silverberg never gave defendants Silverman, SA or Acampora any permission to disclose to any third parties any financial or otherwise confidential

information or documents relating to plaintiffs stemming from plaintiffs' attorney-client relationship with defendants Silverman, SA and Acampora.

62.     Upon information and belief, defendants Silverman, Acampora and SA violated that confidentiality obligation in the course of urging plaintiffs' engaging Ryniker and RK Consultants which culminated on November 16, 2020 in the Ryniker Agreement.

63.     As Silverman, Acampora and SA well knew, plaintiffs had no attorney-client relationship with Ryniker, RK Consultants, Carew or PJC.

(ii)     *The Defendants' Insertion into Plaintiffs' Business*

64.     Defendants Ryniker and Carew in December 2020 – approximately one month after the signing of the Ryniker Agreement – visited the headquarters of M C Packaging, ostensibly to assist Mr. Silverberg and the other plaintiffs in evaluating the plaintiffs.

65.     In reality, as events unfolded, the "inspection visit" of Ryniker and Carew was an early step in the defendants' overall scheme (i) to wrest control of the plaintiffs' business and property (which included a commercial building owned by plaintiffs with an independently appraised market value of approximately $47 million) from Mr. Silverberg and the other plaintiffs and (ii) to extract substantial, duplicative and wasteful fees from plaintiffs.

66.     In yet another stage of their ultimate scheme to seize plaintiffs' business and property, defendant Silverman arranged for what he termed an "all-hands-on-deck" conference call with representatives of M&T and others.

67.     During that conference call in January 2021, defendant Silverman announced that he was the self-described "new sheriff-in-town." When Mr. Silverberg – a key participant in the January 2021 conference call – said that plaintiffs' business as a whole was "over-collateralized" and functioning well, Silverman directed Mr. Silverberg to stop speaking.

68.    Defendant Ryniker, who was also a participant in the January 2021 conference call and who at that point had essentially no familiarity with plaintiffs' businesses or their financial situation, directed that all further communications should be made through him.

69.    Among the negative consequences of the January 2021 conference call, M&T demanded that plaintiffs sign a "forbearance agreement" prepared by M&T. When Mr. Silverberg expressed reservations about executing the M&T-proposed "forbearance agreement," defendants Silverman and Ryniker insisted that Mr. Silverberg do so. He did so.

70.    The "forbearance agreement" with M&T was extremely costly. Plaintiffs were compelled to pay $250,000 to M&T for the "forbearance agreement."

(iii)    *Defendants' Ongoing Incursions into Plaintiffs' Business*

71.    Defendants' negative activities were not limited to plaintiffs' relationship with M&T. Among other things, Silverman, citing his self-proclaimed "close" relationships with other banks, purported to attempt to arrange refinancing through Flushing Financial Corporation ("Flushing Bank").

72.    Contrary to Silverman's claims of a strong relationship with Flushing Bank, in or about February or March 2021, Flushing Bank rejected plaintiffs' efforts to participate in the refinancing of M C Packaging and the other plaintiffs.

73.    Again invoking his self-proclaimed relationships with banks and financial firms, Silverman introduced plaintiffs on March 9, 2021 to NorthMarq Capital LLC ("NorthMarq") and established contact between Robert Delitsky ("Delitsky") of NorthMarq and Mr. Silverberg.

14

74.    Since NorthMarq and Delitsky would be exposed to confidential information regarding plaintiffs, Mr. Silverberg required NorthMarq to execute a non-disclosure agreement ("NDA") in March 2021.

75.    As part of defendants' overall scheme to defraud, defendant Silverman, without Mr. Silverberg's authorization, disclosed to NorthMarq and Delitsky, on or about March 30, 2021, plaintiffs' forbearance agreement with M&T.

76.    Indeed, Mr. Silverberg objected to Silverman's unauthorized disclosure of the forbearance agreement.    Specifically, Delitsky, on March 30, 2021, sent an email to Mr. Silverberg stating: "Also please send us an email about the forbearance you agreed to with M&T, why it was necessary and the current status. *Ken Silverman sent me the agreement last night that I need to go thru.*" *See* email dated March 30, 2021, 8:12 A.M. (emphasis supplied).

77.    In April 2021, defendants Silverman, SA, Ryniker, RK Consultants and Carew introduced the concept of engaging the banking services of Bethpage Federal Credit Union ("Bethpage Bank").    Neither Mr. Silverberg nor any of the other plaintiffs had ever had a relationship with Bethpage Bank, a relatively minor financial entity.

78.    Under extreme pressure from NorthMarq, Delitsky, Silverman, Ryniker, RK Consultants and Carew, Mr. Silverberg executed the highly favorable term sheet submitted by NorthMarq and Delitsky on behalf of Bethpage Bank as the only option to meet the fabricated timing created by defendants.    Plaintiffs also paid a $50,000 deposit at the time of signing the Bethpage term sheet.    As soon became evident, that expenditure by plaintiffs produced no benefit to plaintiffs and foreclosed alternative financing options.

79.    In or about June and July 2021, Bethpage provided plaintiffs with a "commitment letter" whose provisions were radically different from, and far more onerous than, the "term sheet" previously provided by Bethpage.

*(iv)    Defendants' Steady Erosion of Plaintiffs' Business and Property*

80.    From 2021 through 2024, defendants took additional damaging steps to insert themselves through defendant Carew and by other means into the operations and finances of plaintiffs.

81.    Among other things, at the urging primarily of Silverman, defendant Carew on March 1, 2022 assumed a role in plaintiffs' organizations, even to the extent of acquiring an M C Packaging email address for himself.

82.    Likewise, defendants Carew and Silverman insisted that plaintiff M C Packaging enter into a written agreement with defendant PJC, and, consistent with defendants' insistence, plaintiff M C Packaging entered into a written agreement with PJC in or about March 2022.

83.    That agreement proved extremely costly to plaintiffs and was, like the alleged services of Carew, PJC and the other defendants, including defendant Rimôn after its merger or combination in October 2023 with SA, useless, detrimental, and a material cause of the racketeering injury.

84.    Acting at the behest of the other defendants, Carew early in 2022 incorrectly, and without any factual foundation, asserted that plaintiff M C Packaging was not profitable.

16

85.    As defendants each knew, plaintiffs at all relevant times were parties to a relationship with the Industrial Development Authority of the Town of Babylon, New York (the "IDA").

86.    In or about March 2022, defendants insisted, with no adequate factual basis, that plaintiff M C Packaging publicly issue a so-called "WARN" notice under the terms of the federal "Worker Adjustment and Retraining Notification (WARN) Act" and the New York State "Worker Adjustment and Retraining Notification (WARN) Act," as embodied at § 860 *et seq.* of the New York State Labor Law (collectively, the "WARN Act").

87.    In relevant part, the WARN Act in New York applies to businesses with 50 or more employees in New York State and requires advance public notice of business closings or mass layoffs.

88.    At all relevant times, WARN notices were to be provided to, *inter alia*, all affected employees and the chief elected official of the unit or units of local government where the site of employment is located.

89.    This WARN notification requirement included the IDA unit with which plaintiff M C Packaging had a relationship.

90.    In March 2022, defendants began insisting, again without any adequate basis in fact, that M C Packaging issue a WARN notice announcing that the company would be closing as of June 30, 2022.  There were in fact no real business, financial or economic reasons for M C Packaging or the other plaintiffs to cease or close operations.

91.    On or about March 31, 2022, WARN notices were issued regarding the closing of M C Packaging.

17

92.     Indeed, *Newsday* on April 11, 2022, published an article stating that M C Packaging "of Farmingdale will be closing its doors for good as of June 30, terminating the jobs of 88 employees at the plant, according to a WARN notice...."

93.     Defendants Silverman, Acampora, SA, Ryniker, RK Consultants, Carew and Rimôn knew that their insistence on issuance of the WARN notice, in the absence of any adequate factual basis to do so, would lead to the dissolution of plaintiffs' business.

*(v)     The Impacts of the WARN Notice*

94.     Just as each of the defendants knew would happen, the distribution of the WARN notice, including to the IDA, led to a course of events resulting in the demise of plaintiffs' business and property.

95.     For example, on February 23, 2023, the IDA filed litigation against plaintiffs (the "IDA Action") triggered by the unnecessary and ill-founded dissemination of the WARN notices which defendants pressed plaintiffs to issue.

96.     In a blatant conflict of interest, defendants Silverman, Acampora and SA insisted that defendant Rimôn, which had "combined" with SA in October 2023, represent plaintiffs in the IDA Action.  Silverman, Acampora, SA and Rimôn were witnesses to events germane to the defense of the IDA Action and could not, as they knew but never advised plaintiffs, act as attorneys without violation of the ethical rule prohibiting an attorney from acting as an advocate where the attorney should also be a witness.  Defendant Rimôn, like the other defendants, continued to bill plaintiffs for exorbitant fees which plaintiffs paid through 2024 and which were a contributory causal factor in the racketeering injury inflicted by all defendants on plaintiffs.

18

## Count One

### [For Violation of RICO § 1962(c)]

97.    Plaintiffs repeat and reallege each and every allegation of ¶¶ 1 - 96, *supra*.

98.    As alleged earlier in this Complaint, defendants from 2020 through approximately July 2024, engaged in a four-year-long scheme to defraud plaintiffs in violation of 18 U.S.C. §§ 1341 and 1343, the federal mail fraud and wire fraud statutes, which are predicate acts under RICO § 1961(1).

99.    *The RICO Defendants:* For purposes of the elements of a racketeering litigation such as the present action, the persons and entities within the meaning of 18 U.S.C. § 1961 liable for the racketeering conduct are defendants Silverman, Acampora, SA, Rimôn, RK Consultants, Ryniker, Carew and PJC.

100.    *The RICO Enterprise:* That RICO "enterprise" within the meaning of 18 U.S.C. § 1961 was an "association in fact" enterprise consisting of all the named defendants acting collectively as the "Silverman-Rimôn Enterprise."

101.    *The "Conduct of the Enterprise's Affairs":* From 2020 through and including July 2024, the defendants, within the meaning of 18 U.S.C. § 1962(c), conducted or participated, directly or indirectly, in conduct of the affairs of the Silverman-Rimôn Enterprise through predicate acts of racketeering consisting of mail fraud and wire fraud in a pattern of racketeering activity the essential purposes of which were, *inter alia*, (i) to cause plaintiffs to spend in excess of $700,000 in fees to defendants and (ii) to cause the demise and destruction of plaintiffs' business and their property.

19

102.    *Causation:* Defendants' violations of RICO § 1962(c) were both the proximate cause and but-for cause of the injury to plaintiffs' "business and property" interests within the meaning of RICO § 1964(c).

103.    In furtherance of the overall "scheme to defraud" criminalized by 18 U.S.C. §§ 1341 and 1343, defendants transmitted by mail, private delivery service, or interstate wires numerous communications designed to implement the overall scheme to defraud, including, but not limited to, the following:

- The June 17, 2020 retainer agreement among Silverman, SA, Acampora and plaintiffs;

- The November 16, 2020 engagement agreement involving RK Consultants and plaintiffs;

- The November 13, 2020 communication from defendant Silverman to Mr. Silverberg directing Mr. Silverberg "to firm up arrangements" with defendants Ryniker and RK Consultants for a putative "on-site forensic analysis;"

- The March 30, 2021 email from Delitsky to Mr. Silverberg;

- The invoice sent by defendant Silverman on February 8, 2022;

- The August 12, 2021 communication from an SA attorney to defendant Ryniker;

- The March 4, 2022 email from defendant Carew (designating himself as pcarew@mcpkg.com);

- The March 5, 2022 email from defendant Carew;

- The March 7, 2022 email from Carew to defendant Ryniker stating that plaintiff M C Packaging "*may* be marginally profitable...." (emphasis supplied) – an assertion defendant Carew reversed within twenty-four hours on March 8, 2022, in his email to defendant Ryniker;

- The March 8, 2022 email from defendant Carew (utilizing the address "pcarew@mcpkg.com") to defendant Ryniker regarding, *inter alia*, "Sale Process," "Wind Down Assumptions," "WARN Act Liability," and "Auction/Sale..." when there was no factual basis underlying discussion of such topics;

20

- The March 10, 2022 email from defendant Carew stating in part that Carew needed to show counsel "how bad things will be….";

- The March 14, 2022 email from defendant Silverman to Mr. Silverberg stating that defendant Silverman required Mr. Silverberg to "contact" a non-party so that the non-party has "permission to discuss the WARN act and related employee issues" with defendant Silverman when there was no need for any such discussion;

- The March 17, 2022 email from defendant Carew to defendant Silverman regarding "SA Invoices" and requesting the "amount SA will require for a retainer if MCP goes down the wind down route";

- The March 23, 2022 email from Ryniker to Silverman and Carew stating that Mr. Silverberg "just advised me that he will not file WARN this week";

- The March 23, 2022 email from Silverman to Ryniker and Carew stating that Mr. Silverberg "is on tilt," a derogatory reference to Mr. Silverberg;

- The April 26, 2022 communication from Silverman "regarding preparation of memo concerning IDA default issues…";

- The December 18, 2023 email in which defendants demanded that Mr. Silverberg back date, to September 26, 2023, a substitution of counsel form in the IDA Action;

- The June 19, 2024 wire communication in which one of the defendants asserted, "We're going to lie" to the IDA;

- The June 28, 2024 emails among defendants and others;

- The invoice dated July 5, 2024 from defendant Rimôn to "Marc-Robert Industrial, LLC"; and

- Communications from July 3, 2024 through July 9, 2024.

104.    By reason of the foregoing, plaintiffs have sustained injury to their "business and property" within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined by a jury at trial but believed to exceed $100 million, to be trebled pursuant to 18 U.S.C. § 1964(c), together with attorneys' fees, costs, expenses and pre-judgment interest.

21

## Count Two

### [For Conspiracy in Violation of 18 U.S.C. § 1962(d)]

105.    Plaintiffs repeat and reallege each and every allegation of ¶¶ 1 - 104, *supra*.

106.    As set forth in ¶¶ 1 - 90, *supra*, defendants conspired to violate RICO § 1962(d) through violations of RICO § 1962(c).

107.    By reason of the foregoing, defendants have violated § 1962(d) and caused damage to plaintiffs' business and property in an amount to be determined by a jury at trial but believed to exceed $100 million, to be trebled pursuant to 18 U.S.C. § 1964, together with attorneys' fees, costs, expenses and pre-judgment interest.

## Count Three

### [Violation of Fiduciary Duties]

108.    Plaintiffs repeat and reallege each and every allegation of ¶¶ 1 - 107, *supra*.

109.    Defendants at all relevant times owed fiduciary duties of loyalty, honesty, candor and full disclosure to plaintiffs.

110.    By reason of the facts alleged in this Complaint, defendants repeatedly violated the fiduciary duties they owed to plaintiffs.

111.    Defendants' violations of their fiduciary duties have caused injury and damage to plaintiffs in an amount to be determined by a jury at trial but believed to exceed $100 million.

WHEREFORE, plaintiffs demand judgment, jointly and severally, against defendants:

- On Count One, in an amount to be determined by a jury at trial but believed to exceed $100 million, to be trebled in accordance with RICO, together with an award of attorneys' fees, costs, expenses and pre-judgment interest;

22

- On Count Two, in an amount to be determined by a jury at trial but believed to exceed $100 million, to be trebled in accordance with RICO, together with an award of attorneys' fees, costs, expenses and pre-judgment interest;

- On Count Three, in an amount to be determined by a jury at trial but believed to exceed $100 million, together with an award of attorneys' fees, costs, expenses and pre-judgment interest;

- Punitive damages to be determined by a jury at trial; and

- Such other and further relief as the Court determines to be just and proper.

Dated: New York, New York
May 20, 2026

PAUL BATISTA, P.C.

By: _____
Paul Batista
*Attorney for Plaintiffs*
26 Broadway, Suite 1900
New York, New York 10004
631 377 0111
Batista007@aol.com

23